Please rise. This court is now in session. Please be seated. 314-0509, People of the State of Illinois, Capoli, by Richard Leonard v. Gabrielle Escutia, appellant by Dimitri Golfos. Please proceed. Good afternoon, your honors. May it please the court, counsel. My name is Dimitri Golfos. I'm from the Office of the State Appellant Defender, and I represent Gabrielle Escutia. Your honors, after separate jury trials, Gabrielle Escutia and her boyfriend, Ricardo Gutierrez, were convicted of persecutory murder stemming from the shooting of Javier Barrios in Plainfield back in 2007. This past December, this court concluded in a published opinion that Ricardo was arrested at his home at the time of the arrest unlawfully. And the first issue that we've raised in this court is that Gabrielle Escutia was likewise unlawfully arrested at Gabrielle's home. One justice of this court in that published opinion, in a special concurrence, concluded that Gabrielle was likewise unlawfully arrested with Ricardo. Our second argument is that Gabrielle's right to privacy under the Illinois Constitution was violated where these law enforcement officers along with the United States Secret Service without a warrant or probable cause, in an annoying violation of federal law, obtained Gabrielle's telephone records from her cellular telephone provider and also pinged her cell phone to determine her location in the city of Chicago at Ricardo's home. And they pinged that cell phone by using a portable cell site simulator, commonly referred to as a Stingray. Our third argument is that Gabrielle's statements to the police at the police station were involuntary under Missouri v. Siebert because the police used a question first, warn later technique. And our final argument is that Gabrielle was deprived of a fair trial by prosecutorial misconduct during closing and other arguments. While all of these issues are important and they merit your honest attention, my argument today will be focusing on the issue of Gabrielle's unlawful arrest. But if your honest have any questions regarding the other issues, I'll be more than happy to address them. Turning to the issue of Gabrielle's unlawful arrest, there's no dispute in this case that when these officers went to Ricardo's home in Chicago and when these officers left the home with Gabrielle in her squad car, there were not extra circumstances, there was not probable cause, and there was not a warrant to arrest Gabrielle. As to whether Gabrielle was arrested at the home, this positive legal question is whether the officers either threw a use of force or a show of authority to restrain Gabrielle's freedom of movement in such a way that a reasonable, innocent person in Gabrielle's position would not have felt free to leave. And in making that determination, this court looks to a list of about ten factors, and when we weigh those factors in this case, the majority of those factors point to a finding that Gabrielle was arrested at Ricardo's home. The first factor is the number of officers present at the home. Over ten law enforcement officers from multiple jurisdictions went to Ricardo's home, and between seven and ten of those officers went into that home. That is a rather large police presence in a small home that I believe Rebecca indicates was a living room, a kitchen, a hallway, and three bedrooms. A large presence of police officers is one of several alternative factors that the Supreme Court of the United States in Mendenhall says indicates the seizure has occurred. Now, when a reasonable person asks themselves how many officers it takes to go and talk to a witness, the answer that comes to mind is one, maybe two, not ten. When a reasonable person sees ten officers armed, wearing protective vests, walking into a building, and another group of officers outside that building working containment, the word that comes to mind is rape, particularly when it happens in the early morning hours for an elemental surprise, which is something that Detective Pless testified these officers wanted to have. And that takes us to the next factor, which is time and place. This confrontation happened in the early morning hours, just after 5 o'clock, a time when most people are still asleep, and it happened at a private residence, a place where Fourth Amendment protections are at their highest. Making matters worse is that these officers went to the bedroom that Gabriela and Ricardo were sleeping in and woke them up by themselves. There were four of Ricardo's family members in the home, yet the officers did not ask any of those family members to do the waking up. That is a show of authority, it is intrusive, and certainly there was an elemental surprise. Any reasonable, innocent person in Gabriela's position, sleeping in a bed at 5 o'clock in the morning, only to have officers wake her up outside of her door, would have been shocked. The next factor is the moment of the encounter. The officers searched the bedroom that Gabriela was just sleeping in, and the officer requested to search her vehicle. On top of that, Detective Kavisto testified that Gabriela was separated inside the home from the other residents. Now, common sense tells us that if Gabriela is separated from the other residents, her freedom of movement has been restrained. Her location in the home has been determined by the other officers. Furthermore, a reasonable person seeing officers searching the bedroom that she was just sleeping in would know that the officers were looking for evidence of the crime. Couple that with the fact that the officers requested to search her personal vehicle that was on the phone, and that same reasonable person would know that the officers suspect her to be guilty of that crime. And we consider that, in light of all the other factors in this case, particularly time and place, and the number of officers, that reasonable person would know that those officers consider her to be a suspect of a crime that is very serious. The next factor is whether there were any indicia of formal arrest, such as handcuffing. Her record shows that Gabriela was not handcuffed, but that Ricardo was. And a reasonable person seeing her boyfriend being handcuffed would think that her boyfriend has just been arrested. Did she see her boyfriend being handcuffed? She did not testify that she saw it, but I think we can infer from the record that she did, because the testimony, at least from the defendant's witnesses, that they saw Ricardo walking out of the bedroom with handcuffs on, and that Officer Del Toro testified that Ricardo was given to him with handcuffs on, and there was testimony that when Ricardo and Gabriela were brought out of the bedroom, Gabriela was taken to the front room, or the living room, and Ricardo was told to sit down in the kitchen, where the defendant was. So I think we can infer that she knew he was handcuffed. There is no definitive testimony saying that I think it's a reasonable inference, but even if we can't make the finding that she knew that, well, that fact that he was handcuffed is relevant to another factor, which is the subjective intent of the officers. They handcuffed her, which illustrates that they intended, they handcuffed him, which illustrates that they intended this freedom of movement to be restrained. And given that these officers were there to speak, to locate Gabriela, and that they requested both Gabriela and Ricardo to go back to Plainfield, and that those officers were searching not only Ricardo's possessions, but also Gabriela's possessions, I think we can surmise that these officers viewed Ricardo and Gabriela to be similarly situated. The reason why I'm asking that is because it's not necessarily clear to me that you would lump them together because what you're talking about is if this defendant considered, if they were under arrest, a reasonable person. A reasonable person, yes, correct. A reasonable person under the circumstances for this defendant. So I'm not so clear that you would be allowed to lump Ricardo's facts into the facts of the defendant in this case. Do you see my point? I understand your point. I don't necessarily agree with it. I think assuming that Gabriela did know that Ricardo was handcuffed. Well, I mean, that could be a big leap of faith there. Again, we disagree. We have to agree to disagree on that. I don't think it's a big leap of faith. I think it's a reasonable inference. But even if we cannot make that, we can't draw that inference, it is still relevant to the officer's subjective intent of how we're treating these two individuals. And we know that purveyor, they want to talk to both of them, want to take them both back to Plainfield, and they're searching both of their possessions. One officer said that initially she's not a suspect, right? We had multiple officers saying that. And I think on this record that's pretty outrageous because frankly it's not a right lie. And I have no problem coming into this courtroom and accusing both detectives from Plainfield of lying. On this record, we know that these officers linked Gabriela to Javier for border protection. They know that Gabriela and her vehicle generally match the general description given by Julie Nuzzi. We have on this record that these officers went to Gabriela's home in Plainfield to try to find her. They contacted her telephone provider to get her telephone records to try to find her. They talked to the United States Secret Service to trace her cell phone to try to find her, and they traveled in the middle of the night an hour away to Chicago to try to find her. Yet these officers are testifying, oh, she's not even a person of interest. That's ridiculous, and it's a blatant lie. And if these officers are willing to lie about something so basic and so indisputable about whether she's a person of interest, then they're willing to lie about anything, Your Honor, and they can't be trusted. But getting back to the issue of factors, there are more factors that support the finding that she was under arrest. She had her car there at Ricardo's home, yet she didn't drive her car back to Plainfield. She was taken in a squad car back to Plainfield, and the police towed her car back to Plainfield. Now, that's significant. We have to ask ourselves, why would she choose to go in a squad car, travel an hour away, back to her hometown in a squad car, yet leave her own personal car an hour away in Plainfield? Why would she just abandon her vehicle? The only answer to that, I think, is that these officers, either directly or indirectly, made it known to her that they did not want her driving her car back to Plainfield to the police department. They want her in their squad car. And that inference is corroborated by the fact that these officers towed her car. Yes, she gave consent to search, but consent to search is not consent to seize. The Constitution differentiates between search and a seizure. And if you look at her permission to search form, it says nothing about towing or seizing. Now, perhaps these officers asked her orally, and she gave oral consent. But if that happened, then these officers are implying to her, hey, we don't want you driving your car back. And if these officers didn't get permission from her to tow the vehicle, then they're towing it without probable cause or reward, yet another constitutional violation in this case. And that's reflective of their subjective intent, which, again, is another factor that I'm going to get to. Another substantial factor that indicates that she was under arrest was that she wasn't told that she was free to leave, and she wasn't told that she could refuse the officer's request to go to the station. And that's significant when we consider what the Supreme Court of the United States said in Duggan Way v. New York. The court in that case said that a request to come to a police station may easily carry an implication of obligation unless clearly stated to be voluntary. Given that these officers didn't tell her that she could refuse a request to go to the station and that she was free to leave, when we consider that in conjunction with all the other factors in this case, particularly that these officers were out knocking outside her bedroom door at 5 o'clock in the morning, and you had to seek her service out, and she probably doesn't know that they were seeking service, but you've got over 10 officers there, and even more outside were in containment, a reasonable, innocent 18-year-old, and that's what she was. She was 18 years old, fresh out of high school, with a view to that request as more of a demand. And the final factor that supports the finding of an arrest is the subject of intent of both Gabriella and the officers. It's two factors. Obviously, Gabriella testified that she didn't feel free to leave, and of course the officers testified that she was not arrested. But when we look more closely to some of the statements that these officers made at the suppression hearing, they said things that indicate that she was under arrest. For example, Detective Siegel said that when she was outside with Gabriella about to get in the squad car, she intended Gabriella to stay put. And when Gabriella requested to get some of her items from Ricardo's home, Detective Siegel intended that she was not going to be letting Gabriella go back into that house. She admitted that. And that's just another way of saying that Gabriella, her freedom of movement was restrained. Officer Del Toro testified that Ricardo was not free to leave. And again, I acknowledge your Honor's concern about clumping Ricardo and Gabriella together, but when we look at the factors in this case, the vast majority of the factors that were present in Ricardo's case are present here, and there's even additional factors that weren't present in Ricardo's case that are present here. Sergeant Markowski, he testified that when he was outside working containment, he would not have allowed anyone in the home to leave. They would have been stopped. And on top of that, he testified that when Detective Kavisto came outside, Detective Kavisto announced to all the officers who were outside that they had two subjects in custody. That's the last two minutes. Again, there's another thing that illustrates these officers' intent, and that's that when you look at the Will County Jail's arrest form, it says that Gabriella was arrested at 528 in the morning. And Scott Carey, the correctional officer, testified that that information was provided to the Will County Jail by the arresting agency. It was the Plainfield Police Department. So now certainly there are some factors that favor finding that Gabriella was not arrested. I'm sure opposing counsel is going to talk about all of those. But suffice to say, the majority of the factors support the finding that Gabriella was arrested at Ricardo's home. And therefore, we respectfully request that this court conclude that Gabriella was arrested at the home without probable cause. This court can do that without disturbing any other trial court's findings regarding credibility, but this court can and should disturb those findings because it's clearly evident from the record that officers Siegel, Kavisto, Pless, and Markowski were not credible. When you read their testimony, it's actually quite disturbing some of the things you read. I refer to the dispute, the denial of whoever Gabriella was a person of interest. Again, that's absurd. You have other inconsistencies these officers could not agree to. They couldn't agree on which officers knocked on the door of Ricardo's home. They couldn't agree on who answered the door, which of the officers went into the bedroom and woke up Gabriella. Whether the mom gave consent to search her house before or after the officers went into the bedroom. Whether Gabriella remained silent in the car the last minutes of her ride to Plainfield or whether she was in the middle of confessing. They couldn't agree on whether they knew of Ricardo when they drove to Plainfield and whether they considered him a suspect. Some officers say, oh, yeah, we did know him. And some officers said, no, we didn't. And it's funny that the officers who said, yeah, we did know him, were the officers outside of Plainfield who were merely assisting. We have the detectives from Plainfield who were the lead investigators and said they knew nothing about Ricardo. That's just ridiculous. I mean, there's no explanation for that. Additionally, Officer Markowski had a particularly revealing moment in his testimony. He testified twice that Detective Kavisto came outside and announced that they had two subjects in custody. Then he says, well, I can't remember testifying to that. And then he flipped flops and said, well, yeah, actually I do remember saying that, but I was mistaken. Your Honor, Sergeant Markowski slipped up. He admitted the truth when he didn't want to admit the truth and wasn't planning on admitting it. And then when he realized what he said, he dug a hole for himself. He admitted, he said under oath in a court of law that he could not remember what he had just testified to seconds earlier when he clearly did remember. He lied. Thank you, Your Honor. Thank you, Counsel. Counsel? May it please the Court? Counselor, I will address first the point where the defendant was arrested and also would like to address the point that Justice Carter raised, which you can't apply the facts from the defendant in Gutierrez to the facts here. Because even though this was a joint hearing, there's different facts that apply to the different defendants. I must address the Gutierrez opinion because in that case, this court held that the defendant was under arrest at the time the police arrived at the house. I believe it would be in everybody's best interest that there not be conflicting opinions from this court. But you can still find that the defendant here, Escucha, was not arrested at the house, even though the Gutierrez opinion found that he was arrested at the house. Counselor went through the different points of Mendenhall, the important points in Mendenhall that this court found in Gutierrez was that the defendant was not free to leave and was under arrest because number one, the encounter occurred at the defendant's residence in the early hours of the morning. Number two, the police awoke the defendant from his sleep in his bedroom. Number three, the number of police officers at the residence. Number four, the officers searched the defendant's bedroom. Number five, the defendant was not told he was free to leave. And number six, the defendant was handcuffed when transported in a police car to the Chicago Police Station. I'm willing to concede that the first five factors, you can find that. But the sixth factor, where the defendant was handcuffed and placed in a Chicago police car, is different from what we have here. I believe Justice Litton, who wrote this opinion, placed more emphasis on the fact that the defendant was handcuffed and placed in a police department vehicle. It was a marked vehicle. You're not suggesting that if she's placed in the vehicle but isn't handcuffed that she's not possibly under arrest? She was not under arrest. That is what I'm arguing. You're saying that it was simply the absence of the handcuffs? Yes. And also, she... Well, let me get back to Gutierrez and come back to your question. In Gutierrez, this court found, as did the trial judge, that they found that the officers were credible. The trial judge found that the officers were credible and the defendant's witnesses were not credible. This court agreed and found that the trial judge's findings were not against the manifest witness, the evidence. However, this court found that the trial judge's legal conclusion was incorrect. So the defendant speaks a lot about people's state of mind and what the defendant was thinking and what the police officers may have been thinking. But Gutierrez, which I think we're kind of bound by, states that this court considered the trial judge's factual findings to be correct. So the answer to your question is the officers did not testify that they placed the defendant in the vehicle. The officer's testimony was that they asked the defendant if she would come down to the Plainfield Police Department and speak with them. In Gutierrez, there was a question about attenuation. Yes, attenuation. I can get to that later. But I don't believe we need any attenuation in this case because you should not find that it was an illegal arrest. My argument is, and I believe the correct inference is, that the defendant was not arrested or in custody until she gave an incriminating statement. Now, attenuation is not argumentative. No. I mean, that's a correct statement. Right. And in Gutierrez, it was remanded for an attenuation. Yes. I don't know if it was argued in the Gutierrez case or not, but that would be this court's prerogative whether to find that she was arrested at the house and therefore remanded for attenuation here. Would that be an issue if there was a problem with the... not granting the motion to suppress? Would that then be an issue in this case? If it was not granted, then attenuation would be an issue in this case. But not raised by either side. But it was not raised by either side. I don't believe we need to get to the issue of attenuation. Let me get back to what the officers said, which the trial judge in this court agreed was... Before you get to that, there was a petition for leave filed with the Supreme Court in January, but that hasn't been ruled on yet. Is that correct? Petition for leave to appeal? Correct. In this Gutierrez case? Correct. It was denied. It was denied. When was that? I don't remember. I think it may have been March of this year. March of this year. Yes, I checked that before our oral argument today. Thank you, counsel. So Gutierrez stands right now unless the Attorney General wishes to do a search for certiorari to address these issues because they are Fourth Amendment issues and the U.S. Supreme Court would have the final say. In the Gutierrez case, there are two different defendants and there are two different circumstances in part. In part, there are similar circumstances. Correct. That was what the first five were talking about. Yes, yes. I think the main problem here that was in Gutierrez that is not present here is you have the handcuffing of the defendant and placing him in a marked squad car in the back seat. Let me get back to the facts. And where was she placed in the squad car? Well, I will answer that question right now. She was not placed anywhere in the squad car. Let me back up and say that the officers testified that, like I said, they asked her if she would come down to the Plainfield Police Department and she voluntarily consented. Nobody put a hand on the defendant. The defendant walked to the police car. She opened the door and sat in the front seat of the police car. Both officers testified that she was not a suspect and that she was free to leave. So she was in the front seat, not the back, right? Correct. It was an unmarked squad car from the Plainfield Police Department. And that's a distinction of importance. That is very important, yes. Because that shows that she voluntarily consented. She wasn't under arrest. There was no show of authority. The police officers testified that they had no idea that the defendant may have been a suspect or a defendant or the perpetrator. They just believed that she was a witness. Now the officers... Who were they looking for? They were looking for Escutia. They weren't looking for Ricardo. No. So they're looking for her. Yes. She's 18 years old. Yes. And you look at the first five actors. Yes. They show up in the house and there are how many? There's approximately six to ten officers. Ten was the greater limit. Right. And there were six or seven occupants in the house. Most of the officers were in plain clothes. They had no weapons drawn. But, yes, you're correct. But just because that many police officers show up in the house wouldn't lead a person innocent of the crime to objectively, reasonably believe that she was under arrest just by one factor alone. This is 5 a.m. in the morning. Yes. I understand that. In the bedroom. Yes. Well, let me get back to the bedroom. They knocked on the bedroom door, and she came to the door along with the co-defendant. They asked if they could speak with her, and she voluntarily did. In the meantime, the Chicago police officers, they had the owner of the home, who spoke only Spanish, sign a consent to search form. So they searched the house. They did find a 9-millimeter shell, a live shell. Why did they do that? Why did they search the house if nobody was a person of interest or a suspect? I would be speculating and saying why they searched the house. Well, speculate for us. Speculate for us? Okay, well, I'd like you to decide the case on the facts, but my speculation is that this was a murder investigation. They were going to leave any stone unturned, so it was their standard operating procedure to search the home, search the car. Of a witness who was of no interest? She was of interest. They said she was not of interest. They said that she was a witness. They said that she was not a person of interest. The officers, for some reason, didn't want to use the term person of interest. I don't know why, but just because they searched the vehicle and the house doesn't mean that they thought the defendant was a suspect in the murder. So these 7 to 10 officers went to this house at 5 a.m. in the morning? Yes. And they all testified that no one had armed their guns raised or anything like that? Yes. And I'm willing to concede those first five factors. I understand. Yes. I guess the distinction you're making between our case and the kind of finding baby boots arrest is that very thing, okay, you've got five, but you don't have the rest. Correct. And that's how this was. In your mind, that is the key. That is the key. I think that was the straw that broke the camel's back was the handcuffing and placing in the back of the squad car. Here we don't have that. We have the other five factors, but I don't believe those five factors alone would lead the person to believe that they were under arrest. Mr. Lerner, do you agree that she asked to go to her car and get items from it and was told that she could not? She was not told she could not. What the facts say in the case is she asked for a jacket and her cell phone. Detective Siegel testified that she offered to go get those items for her. Siegel also testified that she was not going to allow the defendant to go back in the house. And I can understand that for officer's safety. You don't want a defendant leaving your presence and then you're going to ride back with them in this unmarked squad car. But she was a witness. She wasn't a person of interest. Yes, she was a witness. So I don't understand where the threat was coming from her. There was no threat. You said that for officer's safety they couldn't let her go back. They could have, but if you pick up a person, you're the officer, you don't know this person, you think they're just the witness, but still... If they went into the home without their weapons raised, no concern for safety there at 5 a.m. in the morning? No. There was 10 of them. So there was no concern for officer's safety there. But when you are having a person leave your presence and then come back with them, there seems to be a problem with officer's safety. That's a good question. It's just something that an officer wouldn't do. For example, there are many times a traffic cop goes up, he stops a car, it's a normal traffic stop, he walks up to the window, but then he gets shot. So just to me, common sense would tell me that even though I don't consider the defendant a suspect, I'm still not going to leave somebody, a person I don't know, leave my presence and then come back and sit with me in a vehicle. But it's okay if you're 7 to 10 to go into an unknown house with unknown people. Well, yes. Because you've got a lot of people there. Well, yes, because you have the 10 officers there, and there's no reason to... Weren't they given permission to enter? I mean, they didn't break down the door. Nobody opened the door and said, come on in. There was just one invited in, that was all. No, they were all invited in. The owner signed a written consent form for them to search the place, but she also gave verbal consent for the officers to come into the home. So you're correct. Justice Litton's decision... I'm sorry, go ahead. I was going to say, excuse me. That's okay. They had to bring her out of another room. She wasn't there at the door when they first came in. Correct, they did not bring her. So she did not give verbal consent for them to enter. No, because this was a guest at this woman's apartment. The woman was the defendant's mother. Correct. So it's her residence. She can let officers in, or she can say they can't come in. If she would have said they can't come in, well, then their inquiry would have stopped there, because if they ignored that request, then we wouldn't have the effects that we have today. Her mother had authority as her residence. Could you repeat that? Her mother had authority as her residence. Yes, that's my argument, and that's the fact. It was her residence. It was, in fact, her residence. Yes. Justice Wright, you had a question? I do. Justice Litton's decision indicates in paragraph 64 that we agree with the trial court's findings of that. This is a different panel. We have two new justices reviewing this conviction. Are we allowed to ignore the majority's observation in the last decision that the trial court's findings were supported by the record? Because the trial court did find that the law enforcement entered the house, didn't draw weapons, and wasn't yelling and screaming. So what is your position on how binding Justice Litton's pronouncement is on the fact that the findings of the trial court were correct? I believe it is very binding. I mentioned before you don't want conflicting decisions. I believe that would be a glaring conflict if you ignored that provision in Gutierrez. So I would ask that you still find that the officers were credible because that's what the trial judge found. The trial judge was in the best position to determine credibility, and he has the sole responsibility of determining not only the credibility of the witnesses but the inconsistencies in the testimony. But, you know, that question is interesting because in Gutierrez there are three statements from the appellate court judges. There is the majority position, which I should say in part because Justice McVeigh concurred with the attenuation only because it represented a majority. She thought it should be reversed, not right. Is that right? Correct. You can correct me if I'm wrong. Okay, Justice Schmidt, the Senate. Yes. So you just want to talk about mixed statements as far as reviewing the findings made by the trial court in the other case. Correct, but the only binding legal authority is the majority opinion. Special concurrences and, of course, dissents are not binding. But there is no majority opinion except for an attenuation hearing. That was the only majority decision. Well, I disagree because I believe you agree that the, correct me if I'm wrong, but you agree that the defendant in Gutierrez also found that they were subjected to a warrantless arrest because I believe your statement was this is still America and we don't do that thing in America. Something like that. So am I wrong that you don't agree that the defendants were arrested at that home? I do agree that they were arrested. I do not believe that I agree to the credibility findings of the trial court. Okay, but I didn't see that in the opinion. It's in paragraph 64 where Justice Litton wrote we, but he doesn't say who we are. Perhaps it was Justice Schmidt and Justice Litton that agreed with the, maybe that is the we. Justice Schmidt dissented, yes. I think you have answered my question and I appreciate your insight. Okay. If I've answered everybody's questions, I'd like to ask you to affirm the trial judge's orders, but render a decision which is not in conflict with the Gutierrez decision. And again, those motions that were suppressed in this case were combined with the judge making these findings. But again, as you pointed out, making specific salient findings as to each defendant in their particular circumstances. Correct. Because there was this after, more or less after the first five factors that we've gone into, there's been a separation of some of that. Correct. That's the point you want to make and you feel is the critical point making this decision different. That is the point I want to make. It's a critical point and I believe that's the correct point. And that makes all the difference in the world in this case. Yes, it does. Thank you, counsel. Thank you.  Thank you, Your Honor. Several points. I want to start by addressing, Justice Wright, your concern about whether you're bound. I don't think you are. My understanding of the law is this court is bound by decisions of the Supreme Court, but this court is free to disagree with other decisions from the appellate court. Only circuit courts in the Third District are bound by decisions of this court. I could be wrong. I don't think I am. I don't think this court is bound by the decision of Gutierrez. Certainly, it would be best to have one that is consistent. Thank you, counsel, on that. I don't think this court is bound. I think, actually, a trial judge is bound by any appellate court decision anywhere in the state. If there's a conflict and there's not a decision from the trial judge's district, then the trial judge can pick and choose between the conflicted cases. But if there's a decision from the trial court's district, the trial court must follow that decision. And I agree with you that we're not bound by other decisions, nor can we overrule other decisions from our court as we've been told by the Supreme Court. That sounds right. The second point that I want to make is we're not arguing whether there was consent to, or was or wasn't consent to enter the residence. Ultimately, that fact is irrelevant in the arrest analysis because when consent was given, it was not given by Gabriela. Gabriela was asleep in bed. Could she have given consent? She didn't live there. It wasn't her home. Correct. But ultimately, we're looking at this issue from the standpoint of a reasonable person, an innocent person in her position. She was asleep in bed, and all of a sudden, officers are waking her up outside the bedroom door. So whether there was consent to enter the residence really is of no consequence because she didn't give it, even if she could have. She didn't give it, and she didn't know who gave it. For all she knew, they could have. But the trial court found that there were no weapons drawn, there was no scouting, so I envision a knock on the door. I mean, this is what the trial court found, and I know you think some of the witnesses were lying, but the trial judge didn't find that. The trial judge specifically found the occupant's credibility was not good, so he went with the officer's version of the events. So somebody knocks on the bedroom door, and Mrs. Scudia watches or sees her boyfriend let out handcuffs, but she isn't handcuffed. Now, doesn't that fact suggest to her she wasn't in custody? They could have helped her as well, and they did not. They could have placed her in a marked squad car. They did not. They could have placed her in the back seat of the unmarked vehicle. They did not. They put her in the front seat without handcuffs, and I presume to make her feel more comfortable, they had a female officer in the car with them. So I think those facts, I would like to hear why you think those facts are not distinguishing from the situation Mr. Gutierrez was in. He didn't even get out of the bedroom without handcuffs. Sure. Let's look at page 18 of the discourse of Pena and Gutierrez. I'm looking at paragraph 56, where we list the ten factors that this court looks at to determine if an arrest was made. By my count, the factors are at least six, if not seven, in favor of a finding of an arrest. Time and place, length, mood, mode, that favors a finding of an arrest. Five o'clock in the morning, private residence. I know a lot of people that get up at five o'clock in the morning. Most people don't. There's no one in their house. Most people don't. A lot of people do in my area. It's a farm community, maybe not in Plainfield. But five o'clock in the morning is not one o'clock in the morning. It is rather startling to have ten officers inside a house at five o'clock in the morning. I don't think we can dispute that. Any person who is in bed asleep at five o'clock in the morning with officers knocking on the bedroom door, not knowing how they got there, would be shocked. What did Mrs. Gutierrez say in her testimony? Did she say that the officers touched her, they were rough with her, they handcuffed her, they forced her out of the house? Her testimony is, they didn't touch me, they didn't handcuff me. So that's the best evidence of how she felt, isn't it? The best evidence of how the people in this house felt was? How Mrs. Gutierrez felt. Mrs. Gutierrez felt the best evidence is that she felt she wasn't free to leave because that's what she said. Yes, they told her that her ex-boyfriend was dead and asked to talk to her about him. And she agreed to go. I don't believe it's in the record that they told her the ex-boyfriend was dead. But if that is the case, then that's them telling her that she should be prepared for something serious. But, again, you look at the factors, most of them favor filing an arrest. You don't have to be in handcuffs to be arrested. There's either use of force or a show of force. Coming into a house with over 10 police officers, working containment outside to make sure that no one leaves, at 5 o'clock in the morning, and the officers going to the bedroom themselves, as opposed to having the mother go or one of Ricardo's brothers go to do the waking up, that is a show of authority. Any person being woken up at 5 o'clock in the morning in their bedroom by the police, not knowing how the police got to be there, would be shot. Does Mendenhall require touching? No. Mendenhall lists four alternative factors that the Supreme Court said indicates that there may be a seizure. You have the presence of several officers. You've got 10 officers. That's one factor. Display of a weapon. Detective Siegel testified that they all had weapons. There wasn't any testimony that they pulled them out, at least not from the standpoint of the state's witnesses. All of the defense witnesses said that they came in guns drawn. Physical touching? No. Language toward the voice, there's conflicting testimony on that. But you don't need all of those factors. The Supreme Court in Mendenhall said that one of those factors could indicate that there's an arrest, and when you look at the 10 factors that this Court listed in Gutierrez, the majority of them point to a finding of an arrest. Someone can be arrested without being handcuffed simply by a show of authority. What about the attenuation? Sure. Not good argument in this case. It has. It absolutely has. It was argued below. The state abandoned it on cue. We have made a preliminary argument regarding attenuation in our brief. We've cited Wong-Sum. We've cited Illinois v. Brown. Yet it's not our obligation to disprove attenuation. It's the state's burden to show attenuation. We've made a preliminary argument in our brief. The state chose not to respond to it. They've abandoned it. So it's raised enough based on your citation of some of the attenuation cases? Again, we don't have to raise it. It's not our burden to disprove attenuation. It's the state's burden to show attenuation. Well, I wasn't asking about the attenuation burden. I was asking about the argument. It was raised below. It was argued by the parties. And I can – No, it's a trial law. Sure, it's a trial law. And if you look at the record, I think this court on the record can determine that there's not attenuation. If you look at temporal proximity, the time of this case and arrest is at – they leave the house at 6.15 in the morning. She's being interviewed in Plainfield at 8.34. That's a relatively short period of time. There's temporal proximity there. Was there intervening circumstances? She wasn't taken for a bandage strip. She wasn't – no indication that she was allowed to speak to counsel. And the state, if you look at page 1206 of the report of proceedings, the prosecutor actually admits in argument that there's not intervening circumstances. If I could please continue to answer your question. Sure. Purpose and flagrancy of the misconduct. The purpose is investigatory, just like it was in Brown. Flagrancy of the misconduct. These officers knew they did not have probable cause. They testified to that. They didn't have a warrant. They knowingly violated the Historic Communications Act by going and getting her telephone records without legal authority or exigent circumstances. The very next day, they go to the circuit court and file an application for those telephone records, citing the Historic Communications Act, so they know what's in there and they know that they didn't have authority to get that at the time. They were colluding with T-Mobile because T-Mobile says, well, your request initially is not good enough. Simply saying that you want these records to follow up on some leads with persons of interest, that's not good enough. You need to say that there's someone out there that's – You're really going beyond the scope of what Mr. Leonard had a chance to address because you didn't argue the phone records earlier. I'm responding to flagrancy of misconduct, the attenuation factor. And I think it shows that these officers acted in bad faith that day. If you're violating federal law knowingly, it shows you're acting in bad faith. If you're violating federal law, you're engaging in some pretty flagrant misconduct. And on top of that, we have the officer's lying suppression. The only factor that he looked for the purpose of attenuation that would support finding of attenuation is that she was given Miranda rights at the station. But we even have an issue there because we've got the question first warrant later issue. And the court found that she was in custody in the squad car. And then she's being given her Miranda rights later at the station. So even that is not very favorable for purposes of finding attenuation. So I think this court can't on this record, as Justice McDade wanted to do, find that there's not attenuation and these statements should be suppressed. I have a question about the scope of your argument. Because six to ten officers entered the house at 5 o'clock in the morning, is it your contention that everybody that was awakened that morning was in custody? No. My argument is not that everyone was in custody, everyone in the house was in custody that morning because the officers came at 5 o'clock in the morning. My argument is when we look at these factors, these factors apply over the time frame from when these officers arrived at the home to when they left with Gabriella in the squad car. So I'm looking at it as from a point where the last factor applies. However, Gabriella was taken to the station in the squad car. So at that moment when they left in the squad car, was she under arrest? And I think if we can, I'm not arguing that just because these officers went there at 5 o'clock in the morning, boom, everyone in the house is under arrest or even that Gabriella is under arrest. My argument is that when we consider the tenth factor that this court has listed in paragraph 56 of Gutierrez, the majority of those factors weigh in favor of a final arrest. When we consider all those factors, the totality of those factors, from the standpoint of a reasonable person. So the only difference is when she was seated in the front seat of the squad car, that's the only difference between the other occupants of the house. The other occupants were separated, they were spoken to separately, they followed directions of the officers. The only difference you're saying is she was placed in the front seat of the squad car. No, not at all. There's all kinds of differences. The police were there to speak to her. They want her to go back to Plainfield. They were searching the bedroom that she was sleeping in. They wanted to search her car. Her car was there to drive back to Plainfield and she didn't take it. The police towed her car. You have the subjective intent of the officers saying, stay put. I understand. So unless the court has any further questions, if I could just briefly conclude, we respect the request that you reverse Gabriella's convictions, remand her for her proceedings, and I thank you all for your time. Thank you both for your arguments. So the court will take this matter under advisement. And now we'll have a panel change to the next case.